UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JOY WILLIAMS,                                                                                          Plaintiff,

v.                                                                      Civil Action No. 3:22-cv-619-DJH-CHL

LOUISVILLE RECOVERY SERVICE, LLC,                                                     Defendant.

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Plaintiff Joy Williams sued Defendant Louisville Recovery Services, Inc. (LRS) in Hardin Circuit Court, alleging violations of the Fair Debt Collection Practices Act (FDCPA). (Docket No. 1)  LRS removed the case, and both parties now move for summary judgment. (D.N. 12; D.N. 13)  For the reasons explained below, the Court will grant LRS's motion and deny Williams's.

**I.**

Between December 4, 2011, and July 23, 2015, Williams visited the Hardin Memorial Hospital (HMH) emergency department seven times.  (D.N. 12-2, PageID.64–79)  Each time, she signed a document titled "Inpatient and Outpatient Conditions and Authorization for Treatment" (the Authorizations) (*id.*) and was treated by physicians from a third-party company, Elizabethtown Emergency Physicians, LLC (EEP).  (*See id.*)  All of the Authorizations contained the same language, generally providing that the patient consents to medical treatment and agrees to pay for such treatment.  (*Id.*)  The Authorizations also state that "in most situations," the medical providers involved in the patient's care are "independent contractors and practitioners." (*Id.*)

1

Upon reviewing her credit report, Williams found that LRS, a collection agency, "was furnishing credit information concerning four medical debts she alleged[ly] owed to [EEP]." (D.N. 12-1, PageID.47)  Williams sent a letter to LRS disputing the debt, and on March 10, 2021, LRS sent Williams an account itemization reflecting eight debts owed to EEP for each date she received service at HMH between December 4, 2011, and July 23, 2015.[1]  (D.N. 12-2, PageID.64–79)  Based on the itemization, Williams owed EEP $1,986.61 total.  (*See id.*)  On April 1, 2021, LRS, through outside counsel, sent Williams a dunning letter regarding the $1,986.61 she owed EEP.  (D.N. 12-3)  The letter advised Williams that LRS might pursue legal action if she failed to pay the debt.  (*Id.*)

Prior to bringing the present action, Williams filed suit against LRS in Hardin District Court, which dismissed the case without prejudice for lack of jurisdiction.  (D.N. 1-1, PageID.7) Williams then filed the instant action in Hardin Circuit Court, alleging that LRS violated the FDCPA "by falsely implying that it was attempting to collect a single debt from her, by threatening to sue her to collect time-barred debts, and by failing to notify her that the alleged debts were time barred and that she would not be sued to collect the debts."  (*Id.*, PageID.10) Both parties now move for summary judgment.  (D.N. 12; D.N. 13)

**II.**

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see* 56(c)(1).  For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party.

---

[1] Although Williams visited HMH seven times, the account itemization showed eight debts because Williams incurred two different charges for her March 9, 2014 visit.  (*See* D.N. 12-2, PageID.75–76)

*Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, the Court "need consider only the cited materials." Fed. R. Civ. P. 56(c)(3); *see Shreve v. Franklin Cnty.*, 743 F.3d 126, 136 (6th Cir. 2014). If the nonmoving party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the fact may be treated as undisputed. Fed. R. Civ. P. 56(e)(2)-(3). To survive a motion for summary judgment, the nonmoving party must establish a genuine issue of material fact with respect to each element of each of her claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (noting that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial"). "The fact that the parties have filed cross-motions for summary judgment does not mean . . . that summary judgment for one side or the other is necessarily appropriate." *Appoloni v. United States*, 450 F.3d 185, 189 (6th Cir. 2006) (internal quotations omitted) (quoting *Parks v. LaFace Recs.*, 329 F.3d 437, 444 (6th Cir. 2003)). "When reviewing cross-motions for summary judgment, [the Court] must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Id.* (internal quotations omitted) (quoting *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003)).

Under the FDCPA, "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Prohibited conduct includes "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken." § 1692e(5). Debt collectors also may not falsely represent "the character, amount, or legal status of any debt." § 1692e(2)(A). "In order to establish a claim under § 1692e[,] (1) [the] plaintiff must be a 'consumer' as defined by the Act; (2) the 'debt'

3

must arise[] out of transactions which are 'primarily for personal, family or household purposes;' (3) [the] defendant must be a 'debt collector' as defined by the Act; and (4) [the] defendant must have violated § 1692e's prohibitions." *Wallace v. Washington Mut. Bank, F.A.*, 683 F.3d 323, 326 (6th Cir. 2012) (quoting *Whittiker v. Deutsche Bank Nat. Tr. Co.*, 605 F. Supp. 2d 914, 926 (N.D. Ohio 2009)). Here, LRS only disputes the fourth element. (*See* D.N. 13) The Court will first consider whether LRS threatened to sue to collect time-barred debts and then address whether LRS misrepresented Williams's debt in the dunning letter.

**A.      LRS did not threaten to collect time-barred debts.**

"[W]here a debt collector threatens to sue on a debt that it knew was time-barred by the statute of limitations, a violation of the FDCPA will lie." *Brewer v. Portfolio Recovery Assocs.*, No. CIV.A. 1:07CV-113-M, 2007 WL 3025077, at *2 (W.D. Ky. Oct. 15, 2007) (internal quotations omitted) (quoting *Gervais v. Riddle & Assocs., P.C.*, 479 F. Supp. 2d 270, 273 (D. Conn. 2007)). The parties dispute the statute of limitations applicable to actions brought pursuant to the Authorizations.[2] LRS contends that it did not threaten to collect time-barred debts because the debts at issue are governed by written contracts subject to the statute of limitations provided by Ky. Rev. Stat. § 413.090 or § 413.160. (D.N. 13-1, PageID.96) Section 413.090 states that actions based on a written contract executed before July 15, 2014, "shall be commenced within fifteen (15) years after the cause of action first accrued." Ky. Rev. Stat. § 413.090(2). Section 413.160 creates a ten-year limitations period for actions based on a written contract executed after July 15, 2014.[3] Ky. Rev. Stat. § 413.160. Williams argues that the Authorizations are not written contracts within the meaning of §§ 413.090 and 413.160 but

---

[2] The parties agree that Kentucky law governs the applicable statute of limitations. (*See* D.N. 12; D.N. 13)

[3] The debt Williams incurred from her July 23, 2015 visit to HMH is the only debt of the eight that is potentially subject to the ten-year limitations period under § 413.160.

4

instead are unwritten contracts subject to the five-year limitations period provided by Ky. Rev. Stat. § 413.120(1). (D.N. 12-1, PageID.52)

The Supreme Court of Kentucky considered a similar dispute in *Mills v. McGaffee*, 254 S.W.2d 716 (Ky. 1953). In evaluating the applicable statute of limitations, the *Mills* court differentiated a written contract from a nonwritten contract:

> [I]f the contract be partly oral and partly in writing or if a written agreement is so indefinite as to necessitate a resort to parol testimony to make it complete, the 5-year statute of limitations concerning 'contracts not in writing' would be applicable just as though the contract had rested entirely in parol. 53 C.J.S., *Limitations of Actions*, § 68, p. 1030.
>
> A written contract is one which is all in writing, so that all its terms and provisions can be ascertained from the instrument itself. 45 *Words & Phrases*, p. 605; 53 C.J.S., *Limitations of Actions*, § 60, p. 1017. The cases generally hold that a written instrument which sets forth the undertaking of the persons executing it or discloses terms from which such an undertaking can be imported, and which shows the consideration for the undertaking, and which identifies the parties thereto, will be considered a contract in writing. *See* Annotation to 3 A.L.R.2d, Sec. 2, p. 812, *et seq*[.]

*Mills*, 254 S.W.2d at 717. In short, "[t]o be a written contract, the document must contain all the essential elements of the contract." *Williams v. Ford*, No. 3:01CV-664-H, 2002 U.S. Dist. LEXIS 14536, at *6 (W.D. Ky. Aug. 1, 2002) (citing *Gray v. Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers, Loc. No. 51*, 447 F.2d 1118, 1120–21 (6th Cir. 1971)).

Williams argues that the Authorizations are not written contracts because they "fail to identify all of the parties to the agreement, the services to be provided under the agreement, and the fee and prices for the services and products under the agreement." (D.N. 12-1, PageID.52) Under the heading "PROFESSIONAL SERVICES," the Authorizations provide, in relevant part:

> In most situations, the physician and allied health care providers involved in your care . . . are independent contractors and practitioners. These physicians and allied health care providers are not agents, servants or employees of Hardin

> Memorial Hospital (HMH). Charges for services provided by these practitioners will be billed separately.

(D.N. 12-2, PageID.66) And under "FINANCIAL AGREEMENT AND ASSIGNMENT OF BENEFITS," the Authorizations state:

> I certify that the information given by me is correct and accept full responsibility for all charges associated with the care provided, including those services as stated above. Payment of any portion of my bill not covered by a third[-]party payor is due upon discharge unless HMH has agreed to other arrangements . . . . After reasonable notice, any unpaid account may be turned over to a collection agency and/or attorney for collection. Should it be necessary for the hospital/medical provider to pursue collection, I agree to pay all reasonable collection costs, including court costs and attorney's fees incurred in collecting my account.

(*Id.*) Citing these provisions, LRS argues that the Authorizations do contain the essential terms of the agreement: "In the Authorizations, Williams promised to 'accept full responsibility for all charges associated with the care provided, including those services stated above[,]'*i.e.*, those provided by independent contract physicians such as EEP." (D.N. 15, PageID.132 (alteration in original) (quoting D.N. 12-2, PageID.66)) The Court must therefore determine whether the Authorizations provide the parties to the agreement, services to be provided, and prices, and thus qualify as written contracts.

### 1. Parties to the Agreement

Although EEP is not explicitly named in the Authorizations, LRS argues that EEP is entitled to enforce the Authorizations against Williams as a third-party beneficiary to the contracts. (D.N. 13-1) Williams maintains that LRS must rely on parol evidence to show that EEP is a party because the Authorizations only reference "unidentified independent contractors." (D.N. 12-1, PageID.53–54)

Under Kentucky law, "[o]rdinarily, the obligations arising out of a contract are due only to those with whom it is made; a contract cannot be enforced by a person who is not a party to it

6

or in privity with it, except . . . under certain circumstances, [such as] by a third-party beneficiary." *Prime Finish, LLC v. Cameo, LLC*, 487 F. App'x 956, 959 (6th Cir. 2012) (internal quotations omitted) (alteration in original) (quoting *Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 579 (Ky. 2004)). But "a third party may enforce a contract made for its 'actual and direct' benefit." *Louisville Gas & Elec. Co. v. Cont'l Field Sys., Inc.*, 420 F. Supp. 2d 764, 770 (W.D. Ky. 2005) (quoting *Sexton v. Taylor Cnty.*, 692 S.W.2d 808, 810 (Ky. Ct. App. 1985)). "An actual and direct promise for the benefit of a third party will be sufficient to create privity between the promisor and the third[-]party beneficiary." *Id.* (citing *Sexton*, 692 S.W.2d at 810). The third-party beneficiary need not be named in the contract, *id.*; courts may "consider the surrounding circumstances when determining whether a party is an intended beneficiary of a contract." *Prime Finish*, 487 F. App'x at 959 (citing *Hendrix Mill & Lumber Co. v. Meador*, 16 S.W.2d 482, 484 (Ky. 1929)). An action brought by a third-party beneficiary is governed by the statute of limitations for written contracts. *See Home Indem. Co. v. St. Paul Fire & Marine Ins. Co.*, 585 S.W.2d 419, 424 (Ky. Ct. App. 1979) ("Any action brought by the Davises based on their standing as third[-]party beneficiaries of this contract will be governed by the 15-year statute of limitations for contracts.")

Here, the Authorizations were clearly designed to benefit the independent contractors, like EEP, that service HMH's patients. EEP is not explicitly named in the contract, but independent contractors are, and the Authorizations expressly state that patients will be billed for services by those independent contractors. (*See* D.N. 12-2, PageID.66 ("In most situations, the physician and allied health care providers involved in your care . . . are independent contractors and practitioners . . . . Charges for these services will be billed separately.")) As LRS argues, "[b]y having Williams execute the Authorizations, HMH ensured independent physicians such as

7

EEP would be compensated from medical services they provided to HMH's patients." (D.N. 13-1, PageID.95)  The terms of the Authorizations therefore provide that independent contractors, like EEP, are parties to the agreement.  Because EEP was a third-party beneficiary to the Authorizations, the fact that EEP specifically was not named in the Authorizations does not render the agreement "so indefinite as to necessitate a resort to parol testimony to make it complete" in this regard.  *Mills*, 254 S.W.2d at 717.

        2.        **Services to be Provided**

Williams next argues that the Authorizations do not define the services to be provided. (D.N. 15, PageID.102–09)  In response, LRS notes that Williams's Account Inquiry Records describe the services provided.  (D.N. 15, PageID.137 (citing D.N. 12-3))  In reply, Williams contends that LRS is relying on extrinsic evidence to show the services performed because "none of th[at] vital information is contained in the [Authorizations]." (D.N. 16, PageID.147)

According to Williams, the Authorizations are "completely silent as to the services to be rendered to [her]."  (*Id.*)  But the Authorizations generally describe the types of services that patients may receive, stating in relevant part under the "CONSENT FOR TREATMENT" heading:

> I voluntarily consent to care involving diagnostic tests, procedures, and medical treatment as ordered by my admitting and treating physicians: including independent practitioners and his/her assistants or designees.  This consent also includes testing for communicable and bloodborne infectious diseases . . . . I consent to the interpretations of my studies by teleradiologists at an off-site location . . . . Should my physician request the services of outside consultants regarding equipment, etc., used in my care I voluntarily consent to such treatment and procedures.

(D.N. 12-2, PageID.66)  Given that patients execute the Authorizations prior to being seen by a medical provider (*see* D.N. 12-1, PageID.51), the Authorizations are reasonably specific regarding the services to be rendered because the provider would not know what precise services

8

are necessary until seeing the patient. *Cf. DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 264 (3d Cir. 2008) (explaining that contract requiring patient to pay "all charges" rather than more specific price term is "the only practical way in which the obligations of the patient to pay can be set forth, given the fact that nobody yet knows just what condition the patient has, and what treatments will be necessary to remedy what ails him or her"). The Court therefore concludes that the Authorizations are sufficiently "definite and specific" as to the services Williams would receive. *C.A.F. & Assocs., LLC v. Portage, Inc.*, 913 F. Supp. 2d 333, 343 (W.D. Ky. 2012) (internal quotations omitted) (quoting *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997)).

### 3. Prices

Lastly, Williams asserts that the Authorizations are not written contracts because they "do not set forth either the price for the services or products to be charged under the agreements." (D.N. 12-1, PageID.55) According to Williams, the Authorizations, "do not refer to any objective basis on which fees and charges incurred under the agreement will be based" (*Id.*, PageID.56) and instead, LRS must rely on Williams's account statements to verify the amounts owed. (D.N. 14, PageID.120) LRS contends that although "the Authorizations do not include a specific amount or price for the medical services Williams was to receive, they nevertheless constitute written contracts . . . because they contain an explicit promise to pay." (D.N. 13-1, PageID.96)

Under Kentucky law, "[i]f [a] written contract contains a definite promise to pay but does not name the amount, the fact that the amount must be ascertained by evidence aliunde does not bring the contract into the category of one partly in writing and partly oral, but it remains a c[o]mplete, written contract and is controlled by the limitation applicable to written contracts."

9

*Lyons v. Moise's Ex'r*, 183 S.W.2d 493, 495 (Ky. 1944). But "it would be otherwise if parol evidence were necessary to show the promise." *Id.*

The Authorizations here contain an explicit promise to pay, providing that the signee "accept[s] full responsibility for all charges associated with the care provided." (D.N. 12-2, PageID.66) The fact that the Authorizations do not list the specific charges does not render the Authorizations unwritten contracts. Again, the Authorizations are reasonably specific, given that they are executed before the patient is seen. As the Third Circuit Court of Appeals has observed in a case presenting a similar issue,

> [t]he price term "all charges" is certainly less precise than price term of the ordinary contract for goods or services in that it does not specify an exact amount to be paid. It is, however, the only practical way in which the obligations of the patient to pay can be set forth, given the fact that nobody yet knows just what condition the patient has, and what treatments will be necessary to remedy what ails him or her. Besides handing the patient an inches-high stack of papers detailing the hospital's charges for each and every conceivable service, which he or she could not possibly read and understand before agreeing to treatment, the form contract employed by [the hospital] is the only way to communicate to a patient the nature of his or her financial obligations to the hospital. Furthermore, "it is incongruous to assert that [a hospital] breached the contract by fully performing its obligation to provide medical treatment to the plaintiff[] and then sending [him] [an] invoice[] for charges not covered by insurance." *Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707, 719 (E.D. Mich. 2005).

*DiCarlo*, 530 F.3d at 264 (alterations in original) (footnote omitted). The Third Circuit concluded that the term "'all charges' unambiguously can only refer to [the hospital's] uniform charges set forth in its Chargemaster," and thus, extrinsic evidence was not required to establish the price term. *Id.* But even if the term "all charges" is ambiguous in the Authorizations and extrinsic evidence would be required to establish a price term here, the Authorizations would still qualify as written contracts because they "contain[] a definite promise to pay." *Lyons*, 183 S.W.2d at 495.

10

Since the Authorizations include the parties to the agreement, the services to be rendered, and a promise to pay, there is no genuine dispute as to whether the Authorizations contain the essential terms of the agreement and are written contracts subject to the statute of limitations in Ky. Rev. Stat. § 413.090 or § 413.160.  LRS thus did not threaten to collect any time-barred debts.  As LRS observes, "[s]even of the eight separate debts at issue are governed by written contracts executed between December 4, 2011[,] and March 9, 2014, any action on which is subject to a fifteen[-]year statute of limitations," and "[t]he eighth debt is governed by a written contract executed on July 23, 2015, any action on which is subject to a ten-year statute of limitations."  (D.N. 13-1, PageID.87)  Accordingly, LRS did not violate the FDCPA by attempting to collect Williams's EEP debts.

**B.      LRS's dunning letter was not misleading.**

In addition to arguing that LRS attempted to collect time-barred debts, Williams also contends that LRS violated the FDCPA by "misrepresenting the status of all eight alleged EEP accounts/debts as being a single account/debt" in the dunning letter.  (D.N. 12-1, PageID.60)  Williams notes that the account number provided in the dunning letter "corresponds to the same EEP Account [number] for services rendered on March 9, 2014."  (D.N. 14, PageID.121–22)  The March 9, 2014 account only has a balance of $12.26 (*id.*, PageID.122), but the dunning letter provides $1,986.61 as the amount due, which is the sum of Williams's debts.  (D.N. 12-3; *see* D.N. 12-2)  According to Williams, the dunning letter misrepresents the amount due under the March 9, 2014 account, and "[f]urther, there is nothing in the [dunning letter] from which Ms. Williams or anyone reading the letter could determine or understand that the letter is an attempt to collect eight different accounts covering a four-year period."  (D.N. 14, PageID.122–23)  In response, LRS asserts that "the FDCPA does not require a debt collector to itemize ordinary

11

changes a consumer has incurred with a single particular creditor. Instead, the debt collector is required to state the total amount owed." (D.N. 13-1, PageID.99) LRS also asserts that "Ms. Williams was provided an itemized listing of those accounts shortly before she received the dunning letter, and the dunning letter correctly calculated the amounts reflected in the itemized list without hidden charges, interest, or fees." (D.N. 19, PageID.157)

The FDCPA prohibits debt collectors from misrepresenting "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A). "Courts use the 'least sophisticated consumer' standard, an objective test, when assessing whether particular conduct violates the FDCPA." *Barany-Snyder v. Weiner*, 539 F.3d 327, 333 (6th Cir. 2008) (quoting *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 329 (6th Cir. 2006)). "This standard recognizes that the FDCPA protects the gullible and the shrewd alike while simultaneously presuming a basic level of reasonableness and understanding on the part of the debtor, thus preventing liability for bizarre or idiosyncratic interpretations of debt collection notices." *Currier v. First Resol. Inv. Corp.*, 762 F.3d 529, 534 (6th Cir. 2014) (citing *Barany-Snyder*, 539 F.3d at 333).

The FDCPA does not "require[] a debt collector to provide a complete breakdown of the debt owed." *Wilson v. Trott L., P.C.*, 118 F. Supp. 3d 953, 963 (E.D. Mich. 2015) (citing *Hahn v. Triumph Partnerships LLC*, 557 F.3d 755, 756–57 (7th Cir. 2009)); *see also Scioli v. Goldman & Warshaw P.C.*, 651 F. Supp. 2d 273, 281 n.15 (D.N.J. 2009) ("To be clear, the Court does not hold that a debt collector *must* itemize the fees and costs it seeks in order to comply with the FDCPA."). Indeed, "[a] debt collector need not 'itemize' the debt, so long as its statement of the total is clear and accurate." *Moran v. Greene & Cooper Att'ys LLP*, 43 F. Supp. 3d 907, 914 (S.D. Ind. 2014). Here, Williams does not contend that the total LRS provided in the dunning letter did not accurately reflect the sum of her eight debts to EEP. (*See generally* D.N. 12-1;

12

D.N. 14)  LRS therefore did not violate the FDCPA by providing Williams "the final tab" rather than itemizing her debts to EEP in the dunning letter.  *Vogel v. McCarthy Burgess & Wolff, Inc.*, No. 17-CV-6681, 2020 WL 6134987, at *8 (N.D. Ill. Oct. 19, 2020).  The cases Williams cites in support of her argument are inapposite; as she acknowledges, those cases involved multiple creditors, "an element not present here."  (D.N. 14, PageID.125)

In any event, the FDCPA "does not make actionable every false representation."  *Van Hoven v. Buckles & Buckles, P.L.C.*, 947 F.3d 889, 894 (6th Cir. 2020).  Rather, "[t]he statement must be material, which is to say capable of influencing the consumer's decision-making process."  *Id.* (citing *Miller v. Javitch, Block & Rathbone*, 561 F.3d 588, 596–97 (6th Cir. 2009)); *see Wallace v. Washington Mut. Bank, F.A.*, 683 F.3d 323, 327 (6th Cir. 2012) ("The materiality standard simply means that in addition to being technically false, a statement would tend to mislead or confuse the reasonable unsophisticated consumer.").

Williams argues that, by aggregating her debt, the dunning letter "gave her no meaningful way to choose which accounts to pay or to pay the one debt that could improve her credit" (D.N. 14, PageID.124), but LRS sent Williams an itemization of her accounts before it sent her the dunning letter.  (*See* D.N. 12-2, PageID.64–79; D.N. 12-3)  LRS, therefore, had already notified Williams of the balances on each of her accounts, and thus gave her the opportunity to choose which accounts to pay, by the time she received the letter.  Even the least sophisticated consumer, having received an account itemization before the dunning letter, could determine that the "amount due" on the dunning letter reflects the sum of her debts, notwithstanding that the letter only provides the account number for the March 9, 2014 account.  In short, Williams has failed to show that LRS's dunning letter "would tend to mislead or confuse the reasonable

unsophisticated consumer." *Wallace*, 683 F.3d at 327. Accordingly, LRS is entitled to summary judgment on Williams's claims, and Williams's motion will be denied.

### III

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)  Plaintiff Joy Williams's motion for summary judgment (D.N. 12) is **DENIED**.

(2)  Defendant Louisville Recovery Service, LLC's motion for summary judgment (D.N. 13) is **GRANTED**.

(3)  A separate Judgment will issue this date.

March 13, 2024

David J. Hale, Judge
United States District Court